

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Constancia Ramos Román<br><br>Peticionaria<br><br>v.<br><br>Corporación del Centro de Bellas Artes<br><br>Recurrida | Certiorari<br><br>2010 TSPR<br><br>178 DPR \_\_\_\_ |

Número del Caso: CC-2008-742

Fecha: 30 de abril de 2010

Tribunal de Apelaciones:

      Región Judicial de San Juan Panel III

Jueza Ponente:  Hon. Zadette Bajandas Vélez

Abogado de la Parte Peticionaria:

      Lcdo. Miguel A. Negrón Matta

Abogados de la Parte Recurrida:

      Lcdo. José L. Gándara
      Lcdo. Frank Pérez Jiménez

Materia: Revisión Administrativa

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del pr oceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servici o público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Constancia Ramos Román

     Peticionaria

         v.

Corporación del Centro de
Bellas Artes

     Recurrida

CC-2008-0742


SENTENCIA

San Juan, Puerto Rico, a 30 de abril de 2010.

Por medio del presente recurso de *certiorari* se nos solicita que revisemos la Sentencia emitida por el Tribunal de Apelaciones en el caso de autos. En ella, el foro apelativo intermedio revocó una Resolución de la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Público, en adelante CASARH. Mediante dicha Resolución, CASARH dejó sin efecto la determinación de la Corporación del Centro de Bellas Artes, en adelante CBA, de denegarle a la peticionaria la reinstalación a un puesto de carrera al momento de ser removida de un puesto de confianza.

Examinemos los hechos que originaron la presente controversia.

I

La Sra. Constancia Ramos Román comenzó a trabajar en el servició público en 1979, por medio de un nombramiento transitorio como Técnica de Administración I en el Departamento de Transportación y Obras Públicas.[1]  El 1 de septiembre de 1996 la señora Ramos Román comenzó a laborar en el CBA como empleada de confianza, en el puesto de Gerente de Administración.[2]

El 12 de noviembre de 2001, la señora Ramos Román fue separada de su puesto de confianza.  Mediante comunicación escrita el entonces Gerente General del CBA, Sr. Carlos R. Alicea Cotto, le imputó a la señora Ramos Román actos y omisiones relacionados a ciertas transacciones de personal, en violación a la Ley de

---

[1] En diciembre de 1984, mientras laboraba en el Departamento de Transportación y Obras Públicas, fue ascendida a Técnica de Administración IV.  El 1 de julio de 1986, obtuvo un nombramiento para el mismo puesto, pero esta vez en el servicio de carrera.  Posteriormente, en marzo de 1987, la peticionaria obtuvo un traslado al Cuerpo de Voluntarios al Servicio de Puerto Rico como Técnica de Administración IV.  El 16 de junio de 1987, obtuvo un traslado al Departamento de Estado como Técnica de Administración IV.  En esta última agencia fue ascendida a Técnica de Administración V, luego a Funcionaria Ejecutiva de Presupuesto I y, en diciembre de 1989, a Funcionaria Ejecutiva de Presupuesto II.

[2] No existe controversia entre las partes de que la peticionaria mantuvo el derecho a la reinstalación a un puesto de carrera, a pesar del traslado a un puesto de confianza.  La señora Ramos Román ocupó de forma interina la posición de Gerente General del CBA en dos (2) ocasiones.  La primera ocasión fue por un período de dos (2) meses de duración.  En específico, desde el 16 de julio de 1997 al 16 de septiembre de 1997.  La segunda ocasión fue por un periodo aproximado de siete (7) meses de duración.  En particular, desde el 10 de abril de 2001 al 22 de octubre de 2001.

Personal del Servicio Público;[3] su Reglamento de Personal; y el Reglamento de Personal del CBA.

En particular, se le imputó violar el Artículo 6 de la Ley Núm. 5, *supra*, que requiere a los empleados "[r]ealizar eficientemente y con diligencia las tareas y funciones asignadas a su puesto y otras compatibles con éstas que se le asignen"[4] y "[c]umplir las disposiciones [de la Ley de Personal], y las reglas y órdenes dictadas en virtud [de la misma]".[5] Además, se le notificó que se le privaría de su derecho a la reinstalación a un puesto de carrera.

En consecuencia, a la señora Ramos Román se le formularon tres (3) cargos. En el primer cargo se le imputó recomendar una modificación a la clase de Operador de Equipo de Entrada de Datos el 20 de noviembre de 1998. Dicha modificación resultó en lo siguiente: (1) la creación de la clase de Asistente de Sistemas de Información; y (2) el ascenso del Sr. Pedro Arzuaga a la nueva clase, sin haber obtenido la aprobación de la clase por la Oficina de Recursos Humanos del Estado Libre Asociado, en adelante ORHELA.[6] Por ello, según este

---

[3] Ley Núm. 5 de 14 de octubre de 1975. 3 L.P.R.A. § 1301, *et seq*. (2000).

[4] 3 L.P.R.A. § 1371(3) (1978).

[5] 3 L.P.R.A. § 1371(8) (1978).

[6] Dicha Oficina era conocida anteriormente como la Oficina Central de Asesoramiento Laboral y de Administración de Recursos Humanos, en adelante OCALARH.

primer cargo, el señor Arzuaga fue ascendido a una clase que no formaba parte del Plan de Clasificación, razón por la cual su clasificación era nula.

En el segundo cargo se le imputó a la señora Ramos Román haber recomendado al Gerente General del CBA reclasificar el puesto de Secretaria de la Oficina de Servicios Generales. El fundamento para la reclasificación fue la evolución de funciones a base de nuevas tareas asignadas a la Sra. Evelyn Calderón, quien ocupó el puesto de secretaria de la Oficina de Servicios Generales. Los actos imputados en este cargo datan del 9 de septiembre de 1999.

Por último, en el tercer cargo se le imputó a la señora Ramos Román recomendar el nombramiento regular de la Sra. Evelyn Covas como Oficial Administrativo el 9 de marzo de 2000. La señora Covas ocupaba hasta entonces un puesto de confianza como Secretaria del Gerente General sin que previamente hubiese ocupado un puesto de carrera en el CBA. Según este cargo, la reinstalación de un empleado de confianza al servicio de carrera está condicionada a que antes de ocupar un puesto de confianza el empleado haya ocupado un puesto de carrera. A esos efectos, según este cargo, la señora Covas no había ocupado un puesto de carrera en el sistema de personal previo a su nombramiento en el servicio de confianza en

_____

Previo a ello OCALARH era conocida como la Oficina Central de Administración de Personal, en adelante OCAP.

el CBA. Por ello, el CBA concluyó que la señora Covas no podía ser reinstalada a un puesto de carrera.

De acuerdo con las advertencias contenidas en la aludida carta del 12 de noviembre de 2002, la señora Ramos Román solicitó una vista informal ante el CBA para cuestionar la separación de su puesto. Dicha vista fue celebrada el 20 de noviembre de 2002. Posteriormente, el 22 de enero de 2003, la peticionaria fue finalmente destituida de su puesto de confianza. Además, se le privó de su derecho a reinstalación a un puesto de carrera.

El 28 de enero de 2003, la señora Ramos Román apeló su destitución ante la antigua Junta de Apelaciones del Sistema de Administración de Personal.[7] En dicha apelación, la peticionaria impugnó la privación de su derecho a la reinstalación al servicio de carrera. Más adelante, con motivo de la aprobación de la Ley Núm. 184 de 3 de agosto de 2004,[8] la apelación de la peticionaria se tramitó a través de CASARH.[9]

---

[7] El 5 de noviembre de 2003 la representación legal de la señora Ramos Román enmendó la apelación.

[8] 3 L.P.R.A. § 1461, *et seq.*

[9] La Ley Núm. 184, *supra*, derogó la Ley Núm. 5 de 14 de octubre de 1975, conocida como Ley de Personal de Servicio Público. Además, la Ley Núm. 184, *supra*, creó a CASARH. Esta Comisión tiene jurisdicción sobre las apelaciones surgidas como consecuencia de acciones o decisiones de los Administradores Individuales y los municipios en los casos que se especifican en la Sección 13.13 de la Ley Núm. 184. 3 L.P.R.A. § 1468 (l).

Luego de varios trámites procesales, el 14 de julio de 2006, CASARH emitió una Resolución declarando Ha Lugar la Apelación presentada por la peticionaria.[10] En su Resolución, CASARH adoptó las determinaciones de hechos siguientes:

### A. Gerencia del Sr. Navas

El señor Navas fue Gerente General del CBA hasta el 16 de septiembre de 1997.[11] En esa fecha fue sucedido por el Sr. Francisco Girona, quien ocupó el cargo de Gerente General del CBA hasta el 31 de marzo de 2001.[12] Durante la gerencia del señor Navas, la señora Ramos Román supervisó la Oficina de Recursos Humanos en su carácter de Gerente de Administración hasta que el señor Navas fue sucedido por el señor Girona.[13]

El CBA tenía un diagrama de organización interno que nunca fue sometido para la aprobación de la Oficina de Gerencia y Presupuesto, en adelante OGP.[14] En algunas versiones del aludido diagrama la Oficina de Recursos

---

[10] CASARH adoptó e incorporó en su Resolución el informe rendido por la Lcda. Laura Rechani Ydrach, Oficial Examinadora de CASARH a quien se le delegó la apelación de la peticionaria.

[11] Determinación de Hecho Núm. 7 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 73.

[12] *Íd.*

[13] Determinación de Hecho Núm. 23 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 77.

[14] Determinación de Hecho Núm. 21 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 77.

Humanos se encontraba "bajo la supervisión del Gerente de Administración, aunque en la práctica no era así".[15]

El CBA operó con la anomalía de un plan de clasificación y retribución implantado pero no aprobado por OCALARH.[16] Por ello, desde septiembre de 1996 hasta septiembre de 1997, no se realizaron transacciones de personal relacionadas a aumentos de salarios, reclasificaciones o ascensos.[17]

Bajo la dirección del señor Navas la señora Ramos Román llevó a cabo un análisis preliminar de todos los expedientes de empleados, con la colaboración de una funcionaria de OCALARH.[18] El estudio reveló que había una cantidad significativa de empleados cesanteables por nulidad de sus nombramientos.[19] Además, del estudio surgió "que existían empleados en el CBA que habían estado muchos años como empleados irregulares, pero no existían certificaciones de horas trabajadas que evidenciaran que habían acumulado las 1,800 horas durante tres [(3)] años consecutivos, según lo exigía la Ley [Núm.] 110 de 26 de

---

[15] *Íd.*

[16] Determinación de Hecho Núm. 24 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 77.

[17] *Íd.*

[18] Determinación de Hecho Núm. 25 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 77.

[19] Determinación de Hecho Núm. 26 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 77.

junio de 1958, en adelante Ley 110, [conocida como la] Ley de Personal Irregular de Gobierno".[20]

Asimismo, el informe reveló que los contratos de empleo no indicaban que eran en virtud de un nombramiento irregular de acuerdo con la Ley 110.[21] "[T]ampoco existían certificaciones de que sus servicios habían sido satisfactorios y de que cumplieran con todos los requisitos exigidos por la Ley 110 para otorgarles el derecho".[22] Es decir, no se podía dar por hecho que los empleados con estatus irregular de empleo por tres (3) años o más, cumplían automáticamente con los requisitos para ser empleados regulares.[23]

CASARH estimó probado que "[l]o primordial entonces fue resolver y establecer controles para continuar con el servicio y operación para lograr recaudar dinero para las operaciones diarias del CBA".[24] Como parte de los cambios se confirieron nombramientos irregulares de acuerdo con la Ley 110.[25] Posteriormente, se le otorgó el derecho a ser

---

[20] Determinación de Hecho Núm. 28 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 77-78.

[21] Determinación de Hecho Núm. 29 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 78.

[22] *Íd.*

[23] *Íd.*

[24] Determinación de Hecho Núm. 30 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 78.

[25] Determinación de Hecho Núm. 31 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 78.

empleados regulares a aquellos empleados que cumplían con los requisitos expuestos en la Ley.[26]

### B. Gerencia del señor Girona

CASARH estimó como un hecho probado que a la llegada del señor Girona como Gerente General, la Directora de Recursos Humanos, la Sra. Mayra Rosich, le sometió las hojas de descripciones de los puestos de todos los empleados activos a esa fecha, para que el señor Girona las firmase.[27] No obstante, el señor Girona no firmó las Hojas de Deberes.[28] El problema financiero que afrontaba el CBA tenía mayor prioridad para el señor Girona que conseguir la aprobación del plan de clasificación y retribución.[29]

Por otra parte, **CASARH estimó demostrado que el señor Girona despojó a la señora Ramos Román de la supervisión de la Oficina de Recursos Humanos, así como de otras funciones propias de su puesto.**[30] Posteriormente, entre 1998 y 1999, "el señor Girona contrató al señor Carlos Vélez para retomar el asunto de la preparación de los

---

[26] *Íd.*

[27] Determinación de Hecho Núm. 34 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 78-79.

[28] Determinación de Hecho Núm. 36 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 79.

[29] Determinaciones de Hechos Núm. 36 y 37 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 79.

[30] Determinación de Hecho Núm. 36 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 79.

planes de clasificación y retribución".[31]  No obstante, el señor Vélez "sólo corrigió y enmendó el borrador del plan que estaba implantado y funcionando en el CBA desde la gerencia del Sr. Alcides Ortiz [Ferrari]".[32]  Más adelante, "el señor Vélez fue reclutado por el señor Girona para el puesto de Director de Recursos Humanos".[33] CASARH determinó como un hecho que "[a] partir de ese reclutamiento y hasta su separación en diciembre del 2000, **la apelante [señora Ramos Román] no supervisó la Oficina de Recursos Humanos**, ya que el señor Vélez como empleado de confianza se reportaba directamente al señor Girona, Gerente General".[34]

Para "el mes de octubre de 2001 el único plan de clasificación y retribución aprobado que tenía el CBA era

---

[31] Determinación de Hecho Núm. 38 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 79.  La participación de la señora Ramos Román en dicho proceso se limitó a ciertas consultas del señor Vélez, quien objetaba continuamente las recomendaciones de la señora Ramos Román sobre los aspectos que se le consultaba referente a los planes.  Determinación de Hecho Núm. 40 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 79.

[32] Determinación de Hecho Núm. 41 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 79.  Del expediente ante nuestra consideración no surge el periodo de tiempo durante el cual el señor Ortiz Ferrari fue gerente del CBA.

[33] Determinación de Hecho Núm. 43 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 80.

[34] Determinación de Hecho Núm. 44 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 80.  (Énfasis nuestro).

el de la señora Carmen Junco en 1996".[35] **Todos los empleados de carrera y confianza en el CBA, a excepción de la apelante y su secretaria, tenían títulos de clasificación y sueldos a base de un plan sin aprobar".[36]** El plan fue implantado por el señor Ortiz Ferrari, anterior Gerente General del CBA.[37] Es un hecho probado ante CASARH que **"[e]l CBA operaba y funcionaba a base de esa realidad organizacional y de esos empleados, con sus correspondientes títulos de clasificación y sueldos".[38]**

**La señora Ramos Román "no era la autoridad nominadora" y "no le competía someter un plan o declarar nulas las transacciones y puestos existentes".[39] Tampoco tenía autoridad para obligar al Gerente General a ejecutar sus recomendaciones.[40] Las mismas "podían ser**

---

[35] Determinación de Hecho Núm. 49 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 80.

[36] Determinación de Hecho Núm. 50 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 80-81. (Énfasis nuestro). En el caso de la señora Ramos Román, "el puesto de confianza era tal y como estaba definido en el Plan de Clasificación y Retribución de Confianza, que había sido aprobado por […] OCAP, durante la incumbencia de la señora Carmen Junco como Gerente General". Determinación de Hecho Núm. 51 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81.

[37] *Íd*

[38] Determinación de Hecho Núm. 52 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81. (Énfasis nuestro).

[39] Determinación de Hecho Núm. 53 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81. (Énfasis nuestro).

[40] Determinación de Hecho Núm. 54 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81. (Énfasis nuestro).

**consideradas o no por el Gerente General, y estaban sujetas a la decisión final de éste".**[41]

### C. Cargos imputados a la señora Ramos Román

Los cargos responsabilizan a la señora Ramos Román de las acciones de personal tomadas por ser Supervisora de la Oficina de Recursos Humanos.[42] No obstante, "la realidad es que ejerció estas funciones de forma esporádica y circunstancial", ya que el señor Girona asumió, personalmente, la supervisión de esa oficina tan pronto comenzó a trabajar en el CBA.[43]

El señor Girona, Gerente General para la fecha de los hechos en controversia, "nunca entrevistó, cuestionó, discutió, conversó o investigó con la apelante [señora Ramos Román] sobre la intención o el motivo de las recomendaciones que la apelante hiciera relacionadas con movimiento de personal".[44] Sin embargo, "[e]stas recomendaciones fueron la base para la destitución de la apelante".[45]

Las transacciones se recomendaron de acuerdo al plan utilizado en la práctica e implantado en el mes de enero

---

[41] *Íd.*

[42] Determinación de Hecho Núm. 20 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 76.

[43] *Íd.*

[44] Determinación de Hecho Núm. 15 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 74-75.

[45] *Íd.*

de 1996.[46]  Ello se debió a que los empleados estaban clasificados y mucho de ellos nombrados a base de ese plan.[47] **En otras palabras, ese plan era el recurso que se utilizaba en el CBA para todas las transacciones de personal.**[48]

CASARH determinó como un hecho, "[e]n cuanto a los cargos uno (1) y dos (2) sobre modificación de clase de operador de equipo de entrada de Datos y Reclasificación de Oficial Administrativo, respectivamente, [que] ambas clases existían en el plan sin aprobar, vigente en la práctica desde enero 1996".[49]  La señora Ramos Román "solamente recomendó la reclasificación de las clases, así como transacciones específicas a la luz de éstas, a requerimiento del señor Girona, Gerente General. **Ambas clases fueron modificadas y aprobadas por el señor Girona**".[50]  La clase de Operador de Equipo de Entrada se reclasificó para atemperarla a la necesidad del CBA de establecer el plan de mecanización implantado por OGP. Éstos requerían un oficial a cargo de los asuntos de

---

[46] Determinación de Hecho Núm. 55 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81.

[47] *Íd.*

[48] *Íd.*

[49] Determinación de Hecho Núm. 56 de CASARH, Apéndice del *certiorari* la Peticionaria, pág. 81.

[50] Determinaciones de Hechos Núm. 57 y 58 de CASARH, Apéndice del *certiorari* la Peticionaria, pág. 81. (Énfasis nuestro).

informática, con unos requisitos exigentes y un nivel de puesto gerencial.[51]

En relación al primer cargo, CASARH estimó probado que el señor Arzuaga, quien recibió el ascenso en controversia, "había asumido en la práctica desde hacía tiempo[…] muchas de las funciones relacionadas con los sistemas de información".[52] Igualmente, "[l]a clase de Oficial Administrativo fue revisada y modificada en términos de funciones para hacerla más flexible y genérica, ya que la especificación de clase en el plan sin aprobar la limitaba a la Oficina del Gerente de Administración, lo cual tampoco se ajustaba a la realidad operacional del CBA".[53]

Es un hecho probado ante CASARH que "[e]l señor Girona quería tener una persona a cargo de los sistemas de computadoras, pero no consideraba oportuno reclutar un Director de Sistemas de Información tal y como lo definían la OGP y la OCALARH, ya que resultaba oneroso al CBA".[54] Igualmente, "no se entendía que se justificara un nivel de puesto de esa categoría para una organización pequeña y

---

[51] Determinación de Hecho Núm. 59 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 81-82.

[52] Determinación de Hecho Núm. 60 de CASARH, Apéndice del *certiorari* la Peticionaria, pág. 82.

[53] Determinación de Hecho Núm. 61 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 82.

[54] Determinación de Hecho Núm. 64 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 82.

una red o sistema que no eran demasiado complicados".[55]
En este sentido, "[e]l señor Girona entendía que se [le] debía otorgar la oportunidad a un recurso interno por lo que delegó dichas funciones al señor Pedro Arzuaga, quien aunque no tenía formación universitaria, tenía muchas aptitudes y habilidad para todo lo relacionado con sistemas de computadoras".[56] Además, éste "había crecido profesionalmente dentro del CBA y siempre fue una persona muy colaboradora y resolutiva".[57] Por ello, "el señor Girona entendió que lo más justo y sensato para el CBA era retener a este empleado con su valiosa experiencia y otorgarle a éste alguna mejora salarial y profesional".[58]

CASARH entendió como un hecho probado que el Gerente General y la Directora de Recursos Humanos de entonces, firmaron los documentos de ambas especificaciones de clases y su revisión final.[59] Además, era "evidente" que "no se podía someter a OCALARH una enmienda a una clase,

---

[55] *Íd.*

[56] Determinación de Hecho Núm. 65 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 82-83.

[57] *Íd.*

[58] *Íd.* Como parte de la propuesta de mecanización aprobada por OGP para el CBA, el señor Arzuaga fue autorizado a tomar un adiestramiento sobre los nuevos programas y sistemas de computadoras. Determinación de Hecho Núm. 66 de CASARH, Apéndice del *certiorari* la Peticionaria, pág. 83.

[59] Dichos documentos se conservaron internamente y se encuentran archivados en la Oficina de Recursos Humanos del CBA.

de un plan que no estaba aprobado por ellos y ni siquiera radicado allí".[60]

En relación al cargo número tres (3), sobre la Recomendación de Nombramiento en el caso de la señora Covas, **la señora Ramos Román "recomendó su nombramiento en un puesto de carrera, pero no indicó el procedimiento o el trámite a seguir".**[61] **Ello se debió a que esa era la responsabilidad del Director de Recursos Humanos, quien debía "analizar todas las recomendaciones que recibía y efectuar las mismas, en este caso el nombramiento, a la luz de su análisis y conforme [a] las leyes y reglamentos aplicables".**[62] **"[L]a Oficina de Recursos Humanos no estaba bajo la competencia de la señora Ramos Román directamente en esa época ni tenía el poder o autoridad para imponer transacción alguna".**[63] **Por ello, la señora Ramos Román "se limitó a recomendar el nombramiento de la señora Covas, que la cualificaban en principio para ocupar la plaza, pero no impartió instrucciones sobre el trámite que había que seguir".**[64] De acuerdo con la prueba

---

[60] Determinación de Hecho Núm. 68 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83.

[61] Determinación de Hecho Núm. 69 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83. Énfasis nuestro).

[62] Determinación de Hecho Núm. 70 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83. (Énfasis nuestro).

[63] Determinación de Hecho Núm. 71 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 83-84. (Énfasis nuestro).

[64] *Íd.*

testifical, "se podía proceder con un reclutamiento especial y emitir una convocatoria interna, como se hizo en otras ocasiones".[65]   Este análisis y trámite es responsabilidad de la Oficina de Recursos Humanos.[66]   **La señora Ramos Román se enteró de la forma en que se tramitó el nombramiento de la señora Covas mediante la carta de formulación de cargos que se le entregara.**[67]

CASARH añadió que "[n]o existía norma ni reglamento, en virtud del cual, la acción de "recomendar y permitir" fueran causas suficientes para aplicar una acción disciplinaria como la que se le aplicó a la apelante".[68] En consecuencia, CASARH concluyó lo siguiente:

> [L]os hechos son claros y los cargos imputados son inmeritorios por lo que procede la reinstalación [de la señora Ramos Román] a su puesto de carrera, ya que de no haber mediado la actuación ultra vires [sic] de parte de la gerencia del CBA, la apelante continuaría como empleada de carrera luego de su separación del servicio de confianza. Es decir, el incumplimiento con las normas y reglamentos para transacciones de personal en el CBA eran única y exclusivamente de la Junta de Directores o del Gerente General que ésta designase. Que la Gerencia interpretara que la antedicha responsabilidad recaía sobre las recomendaciones hechas por la apelante estaba fuera del marco de autoridad delegado a la CBA y al Gerente General. Por tanto la imputación de cargos inmeritorios por parte de la Gerencia del CBA contra la

---

[65] Determinación de Hecho Núm. 72 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 84.

[66] *Íd.*

[67] Determinación de Hecho Núm. 73 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 84. (Énfasis nuestro).

[68] Determinación de Hecho Núm. 74 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 84.

apelante constituyó una actuación ultra vires [sic].

Es por todo lo anterior, que entendemos que la apelante no tenía el poder ni la autoridad para inducir a cualquiera de los Gerentes Generales que dirigieron el CBA a tomar acciones ni obligarlos a ello. A la apelante se le asignó total responsabilidad en los casos donde recomendó transacciones, aún sin tener ella la autoridad para aprobar y efectuar las mismas.

Para realizar cualquier transacción de personal se necesita la aprobación del Director de Recursos Humanos y la del Gerente General, como autoridad nominadora, por lo cual no podemos ser tan ingenuos para creer que ellos no tenían conocimiento de las transacciones de personal que se le imputaron a la apelante, más aún ellos aprobaron dichas transacciones, como pudimos comprar [sic] en el expediente de personal de la Sra. Evelyn Calderón.

La apelante fue sancionada para [sic] asumir las consecuencias de la implantación de un plan no aprobado, decisión y acción sobre la cual no tuvo participación alguna, ya que ocurrió antes de su llegada al CBA.[69]

Conforme lo anterior, CASARH determinó que las alegaciones imputadas no estaban apoyadas en datos precisos que demostraran que la peticionaria faltó a sus deberes. Finalmente, concluyó que la señora Ramos Román fue injustamente culpada y destituida.

Inconforme con la determinación de CASARH, el 14 de septiembre de 2006, el CBA presentó un recurso de Revisión Administrativa ante el Tribunal de Apelaciones. En su recurso, el CBA argumentó que CASARH erró al concluir que la destitución de la señora Ramos Román fue injustificada

---

[69] Resolución de CASARH de 12 de julio de 2006, págs. 18-19, Apéndice del *certiorari* de la Peticionaria, págs. 89-90.

y contraria a Derecho. De igual forma, arguyó que CASARH erró al ordenar la reinstalación de la peticionaria a un puesto de carrera y al decretar el pago retroactivo de salarios dejados de devengar. En particular, alegó que CASARH erró en la apreciación de la prueba oral. Ello, por entender que del expediente administrativo surge que la peticionaria violentó sus deberes como empleada pública, al haber realizado recomendaciones de personal irregulares o nulas.

El CBA reconoció que de ordinario la peticionaria tendría derecho a ser reinstalada a un puesto de carrera una vez cesara en la posición de confianza. Sin embargo, según argumentó el CBA, la conducta de la peticionaria fue de gravedad suficiente para privarle de retornar a un puesto de carrera.

El 30 de junio de 2008, el Tribunal de Apelaciones dictó Sentencia revocando la Resolución dictada por CASARH.[70] El foro apelativo intermedio concluyó que CASARH erró en la aplicación del derecho a los hechos del caso. Ello, a pesar de aceptar como ciertas y correctas todas las determinaciones de hechos esbozadas por la Resolución de CASARH, por estar sostenidas por el expediente administrativo.

El Tribunal de Apelaciones concluyó que CASARH incidió al no evaluar si la señora Ramos Román incumplió

---

[70] El archivo en autos de la copia de notificación de la Sentencia data del 18 de julio de 2008.

los deberes y funciones que le imponía la Ley Núm. 5, *supra*, respecto al principio del mérito. Asimismo, concluyó que la peticionaria recomendó unas transacciones de personal a sabiendas de que las mismas eran ilegales por violentar las disposiciones de la Ley Núm. 5, *supra*, y de los reglamentos aplicables.

Inconforme con el dictamen emitido por el Tribunal de Apelaciones, la señora Ramos Román acude ante nos señalando la comisión de los errores siguientes:

> **Erró el Honorable Tribunal de Apelaciones al concluir que la destitución de la señora Constancia Ramos fue justificada.**
>
> **Erró el Tribunal de Apelaciones al concluir que como cuestión de Derecho la señora Constancia Ramos incumplió los deberes y funciones de su cargo al recomendar las transacciones de personal relacionadas a los empleados Pedro Arzuaga, Evelyn Calderón y Evelyn Covas, justificándose la denegatoria a su reinstalación a puesto de carrera.**
>
> **Erró el Honorable Tribunal de Apelaciones al concluir que las transacciones de personal relacionadas a los empleados Pedro Arzuaga, Evelyn Calderón y Evelyn Covas fueron ilegales.**

El 20 de marzo de 2009 expedimos el mandamiento de *certiorari* en el caso de autos. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II

A.

Las determinaciones administrativas gozan de una presunción de regularidad y corrección.[71] Dicha

---

[71] *Pacheco v. Estancias*, 160 D.P.R. 409, 431 (2003); *Com. Vec. Pro-Mej., Inc. v. J.P.*, 147 D.P.R. 750, 761 (1999).

presunción debe sostenerse por los tribunales, salvo que la misma logre ser derrotada mediante la identificación de evidencia sustancial que obre en el expediente administrativo.[72]

El expediente administrativo constituye la base exclusiva para la decisión de la agencia y para la revisión judicial de la misma.[73] Por ello, **la parte que impugna judicialmente las determinaciones de hechos de una agencia administrativa tiene el peso de probar que "existe otra prueba en el récord que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración".[74]**

La facultad del foro judicial para revisar las determinaciones de hechos de las agencias está limitada por la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme, en adelante L.P.A.U.[75] Esta Sección establece que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el

---

[72] *López Echevarría v. Adm. Sist. Retiro*, 168 D.P.R. 749, 752 (2006); *Henríquez v. Consejo de Educación Superior*, 120 D.P.R. 194, 210 (1989).

[73] *Torres v. Junta Ingenieros*, 161 D.P.R. 696, 708 (2004); *Mun. de San Juan v. J.C.A.*, 149 D.P.R. 263, 280 (1999).

[74] *Ramírez Rivera v. Depto. de Salud*, 147 D.P.R. 901, 905 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 131 (1998). (Énfasis nuestro).

[75] 3 L.P.R.A. § 2175.

tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo".[76]

Hemos definido el concepto de evidencia sustancial como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.[77] Ello no requiere que a la luz de la prueba que obre en los autos, la decisión de la agencia refleje la única conclusión lógica a la que podría llegar un juzgador. El criterio rector en estos casos será la **razonabilidad** de la determinación de la agencia luego de considerarse el expediente administrativo en su totalidad.[78] Más aun, **cuando una determinación de una agencia esté sustentada por evidencia sustancial que obre en el expediente del caso, los tribunales deben abstenerse de sustituir el criterio de la agencia por el judicial.**[79]

La revisión judicial de las decisiones administrativas se circunscribe a determinar si la actuación de la agencia es arbitraria, ilegal o tan

---

[76] *Íd. Véanse además, Rebollo v. Yiyi Motors*, 161 D.P.R. 69, 76-77 (2004); *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70, 75 (2000); *Domínguez v. Caguas Expressway Motors, Inc.*, 148 D.P.R. 387, 397 (1999).

[77] *Ramírez Rivera v. Depto. de Salud*, *supra*, pág. 905; *Misión Ind. P.R. v. J. P.*, *supra*, pág. 131; *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670, 687 (1953).

[78] *Íd. Véase además, Otero v. Toyota*, 163 D.P.R. 716, 727-728 (2005).

[79] *Otero v. Toyota*, *supra*, 728 (2005); *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85, 95 (1997).

irrazonable que constituya un abuso de discreción.[80]   Al enfrentarse a una petición para revisar judicialmente una determinación administrativa, el tribunal debe analizar si conforme al expediente administrativo: (1) el remedio concedido fue razonable; (2) las determinaciones de hechos están sostenidas por evidencia sustancial; y (3) las conclusiones de derecho del organismo administrativo son correctas.[81]

Existe una práctica judicial claramente establecida de conceder gran consideración y deferencia a las decisiones de los foros administrativos.[82]   Sin embargo, ello no significa una abdicación de la función revisora del foro judicial.[83]   Por el contrario, los tribunales tienen el deber de proteger a los ciudadanos contra posibles actuaciones *ultra vires*, inconstitucionales o arbitrarias de las agencias.   Ahora bien, "el foro judicial podrá sustituir el criterio del organismo administrativo por el propio sólo en aquellas ocasiones

---

[80] *Torres v. Junta Ingenieros*, *supra*, 708 (2004); *Fuentes v. Administración de Reglamentos y Permisos*, 134 D.P.R. 947, 953 (1993).

[81] *Pacheco v. Estancias*, *supra*, pág. 431 (2003); *P.R.T.Co. v. J. Reg. Tel. de P.R.*, 151 D.P.R. 269, 281 (2000); *Mun. de San Juan v. J.C.A.*, *supra*, págs. 279-280 (1999).

[82] *Otero v. Toyota*, *supra,* pág. 727; *Rebollo v. Yiyi Motors*, *supra,* pág. 77.

[83] *Rivera Concepción v. A.R.P.E.*, 152 D.P.R. 116, 122-123 (2000).

que no encuentre una base racional que fundamente la actuación administrativa".[84]

Por otra parte, las conclusiones de derecho de las agencias administrativas son "revisables en todos sus aspectos por el tribunal".[85] El razonamiento detrás de esta disposición es que los tribunales gozan de peritaje en cuanto a las cuestiones jurídicas, por lo cual no se adelanta ningún fin público otorgándole deferencia a la agencia en cuanto a este aspecto.

No obstante, ello no quiere decir que los tribunales deben descartar livianamente las conclusiones de derecho hechas por las agencias administrativas. Nuestra jurisprudencia interpretativa señala que los tribunales deben dar gran peso y deferencia a la aplicación e interpretación que hagan las agencias con respecto a las leyes y reglamentos que éstas administran.[86] Ello, porque al tratarse de áreas del Derecho que manejan a diario, las agencias desarrollan un conocimiento especializado que no debe ser menospreciado.[87]

El criterio de revisión en cuanto a las interpretaciones jurídicas hechas sobre los estatutos que

---

[84] *Rebollo v. Yiyi Motors*, *supra*, pág. 78.

[85] 3 L.P.R.A. § 2175.

[86] *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, *supra*, pág. 75.

[87] *Rivera Rentas v. A & C Development*, 144 D.P.R. 450, 461 (1997).

maneja la agencia debe ser también uno de razonabilidad.[88] Ahora bien, la deferencia que merecen estas interpretaciones legales cede ante una actuación irrazonable o ilegal que justifique que el tribunal ejerza su función revisora en protección de la ciudadanía.[89] Las conclusiones de derecho que no envuelvan interpretaciones de las leyes y reglamentos administrados por la agencia, ni que caigan dentro de la rúbrica de especialidad de la misma, son revisables por los tribunales sin limitación alguna.[90]

                                    B.

    La Corporación del Centro de Bellas Artes es una corporación pública creada mediante la Ley Núm. 43 de 12 de mayo de 1980, según enmendada.[91] El organismo rector del CBA es una Junta de Directores, que corresponde a la misma Junta de Directores del Instituto de Cultura Puertorriqueña. El CBA cuenta con un Gerente General que funge como su primer ejecutivo. Éste cuenta con los poderes, responsabilidades y facultades administrativas que le han sido delegadas por la Junta de Directores del Instituto de Cultura.[92]

---

[88] *Véase*, *Pacheco v. Estancias*, *supra*, pág. 432.

[89] *Íd.*, pág. 433.

[90] *Misión Ind. P.R. v. J.P.*, *supra*, pág. 132; *Rivera Rentas v. A & C Development*, *supra*, pág. 461.

[91] 18 L.P.R.A. § 1161, *et sec.*

[92] 18 L.P.R.A. § 1161(b).

El Artículo 2 de la Ley Orgánica del CBA,[93] dispone que dicha corporación tiene el poder para "administrar su propio sistema de personal y nombrar todos sus funcionarios, agentes y empleados".[94] Asimismo, el CBA tiene poder para asignarles a sus empleados "las funciones que estime convenientes".[95] De acuerdo con el mencionado Artículo, el CBA es un administrador individual.[96]

**Conforme lo anterior, el CBA es un Administrador Individual al cual le aplicaban las disposiciones de la Ley Núm. 5, *supra*. Según mencionado, dicha Ley fue derogada por la Ley Núm. 184, *supra*. No obstante, para la fecha de los hechos en controversia, la versión estatutaria vigente para la administración de los recursos humanos en el servicio público era la Ley Núm. 5, *supra*.[97] En consecuencia, debemos examinar y aplicar las disposiciones de la referida Ley a la presente controversia.**

C.

La Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5, *supra*, fue aprobada con el propósito de establecer un solo sistema de personal para los empleados públicos. Dicha Ley tenía como política pública

---

[93] 18 L.P.R.A. § 1161, *et seq.*

[94] 18 L.P.R.A. § 1161(a)(i).

[95] *Íd.*

[96] *Íd.*

[97] 3 L.P.R.A. § 1301, *et seq.* (2000).

establecer el mérito como el principio que regiría el servicio público en Puerto Rico. Este principio promueve que las personas que sirven al gobierno sean las más aptas para ello y que todo empleado sea seleccionado en consideración al mérito y a su capacidad. Asimismo, la Ley Núm. 5, *supra*, pretendía evitar que las transacciones de personal estuviesen indebidamente motivadas por discrimen por razón de raza, color, sexo, nacimiento, edad, origen o condición social, o por ideas políticas o religiosas.[98]

La Ley Núm. 5, *supra*, creó un sistema unitario de administración para el personal del servicio público que incluía una Administración Central y los Administradores Individuales. **Los Administradores Individuales se regían por sus propios reglamentos, los cuales tenían que ser conformes al principio de mérito y ser aprobados por OCAP.** En virtud de ello, le correspondía a OCAP aprobar los reglamentos y planes de clasificación de los Administradores Individuales para que fuesen puestos en vigor. Además, **OCAP tenía la facultad de declarar nula cualquier regla que sometieran los administradores individuales que fuera contraria a la Ley Núm. 5, *supra*, y a las normas y reglamentos promulgados por la aludida Oficina.**[99]

---

[98] 3 L.P.R.A. § 1311(1) (2000).

[99] 3 L.P.R.A. § 1347 (2000).

La Ley Núm. 5, *supra*, disponía en su Sección 4.2 lo siguiente:

> Como instrumento eficaz para la consecución de los programas de gobierno, las agencias del sistema de personal serán responsables de establecer y mantener una estructura racional de funciones que propenda a la mayor uniformidad posible y que sirva de base para las diferentes acciones de personal. Para lograr este propósito se establecen las siguientes disposiciones que cumplirán las autoridades nominadoras según les corresponda:
>
> […]
>
> (7) **Será responsabilidad de la Oficina, en el caso de la Administración Central y de cada autoridad nominadora, en el caso de los Administradores Individuales, crear, eliminar, consolidar y modificar las clases de puesto comprendidos en el plan de clasificación.** El Director de Personal será responsable de emitir normas respecto a la creación, eliminación, consolidación y modificación de las clases de puesto para guiar el mantenimiento de los planes de clasificación.[100]

La Sección 4.4 de la Ley Núm. 5, *supra*, disponía sobre los **ascensos**, traslados y descensos lo siguiente:

> (1) La Administración Central o **cada Administrador Individual, según sea el caso, determinará las clases de puestos que debido a las necesidades particulares de la agencia o a la naturaleza de las funciones de las clases de puesto requieren que se cubran mediante el ascenso de empleados.** Para cubrir estas clases de puestos se utilizará el mecanismo de los ascensos, conforme a lo siguiente:
>
> (a) Los empleados en puestos de carrera ascenderán mediante exámenes que podrán consistir de pruebas escritas, orales, físicas, de ejecución, **evaluaciones de experiencia y preparación, evaluaciones de supervisor, análisis del record del trabajo,** resultados de adiestramientos u otros.[101]

---

[100] 3 L.P.R.A. § 1332 (2000). (Énfasis nuestro).

[101] 3 L.P.R.A. § 1334 (2000). (Énfasis nuestro).

En lo que respecta al **reclutamiento y selección de personal**, la Sección 4.3 (11) de la Ley Núm. 5, *supra*, proveía para que se establecieran mediante reglamento procedimientos especiales de reclutamiento y selección "[c]uando no se disponga de registros de elegibles apropiados para determinada clase de puestos y la urgencia del servicio lo justifique".[102]   La Ley Núm. 5, *supra*, reconoció como parte del principio de mérito el derecho de reinstalación.   La Sección 5.10 de la referida Ley disponía, en lo pertinente, lo siguiente:

> Los empleados de confianza serán de libre selección y remoción.   Serán igualmente de confianza aquellos que aunque siendo de libre selección sólo pueden ser removidos por justa causa por disposición de ley o aquéllos cuyo nombramiento sea por un término prefijado por ley.
>
> (a) **Todo empleado que tenga la condición de empelado regular en el Servicio de Carrera y pase al Servicio de Confianza tendrá derecho absoluto a ser reinstalado en un puesto igual o regular al último que ocupó en el Servicio de Carrera, a menos que su remoción del puesto de confianza se haya efectuado mediante formulación de cargos,** y disponiéndose, que será acreedor a todos los beneficios en términos de clasificación y sueldo que se haya extendido a la plaza que ocupaba, durante el término en que sirvió en la posición de confianza.[103]

D.

Para instrumentar la Ley Núm. 5, *supra*, OCAP adoptó el Reglamento de Personal: Áreas Esenciales al Principio

---

[102] 3 L.P.R.A. § 1333 (2000).

[103] 3 L.P.R.A. § 1350 (2000).   (Énfasis nuestro).

de Mérito,[104] según enmendado, en adelante Reglamento Núm. 2663. Dicho Reglamento es aplicable a toda la Rama Ejecutiva del Gobierno de Puerto Rico, incluyendo a las corporaciones públicas y a los municipios.[105]

El Reglamento Núm. 2663 dispone sobre el derecho de reinstalación lo siguiente:

> **Si un empleado en el servicio de carrera con [e]status regular pasa al servicio de confianza y posteriormente se separa del mismo, tendrá derecho absoluto a ser reinstalado con categoría de empleado de carrera, en un puesto igual o similar al que ocupaba en el servicio de carrera al momento en que pasó al servicio de confianza.** Deberá ser reinstalado preferiblemente en la misma agencia donde sea separado. La Administración Central y cada Administrador Individual reglamentarán la forma de implementar esta disposición.[106]

De las disposiciones antes citadas se desprende que el derecho de reinstalación estaba disponible para aquel empleado de confianza que provenía del servicio de carrera. El propósito de ello era hacer justicia al empleado de carrera que se veía expuesto a perder la seguridad de su empleo al aceptar una posición en el servicio de confianza.[107]

---

[104] Reglamento Núm. 2186 de 30 de noviembre de 1976, según enmendado por el Reglamento Núm. 2663 de 17 de marzo de 1980.

[105] El Reglamento Núm. 2663 sólo excluye de su aplicación a los empleados de las agencias y corporaciones públicas que funcionan como empresas o negocios privados y de aquellas otras cuyos empleados tienen derecho a negociar colectivamente.

[106] Sección 5.5 del Reglamento Núm. 2663, *supra*. (Énfasis nuestro).

[107] *Véase*, *Fidalgo Colón v. A.D.T.*, 112 D.P.R. 1, 7 (1982).

E.

En cumplimiento con las disposiciones antes mencionadas, el CBA adoptó el Reglamento de Personal de la Corporación del Centro de Bellas Artes, en adelante Reglamento del CBA.[108] Dicho reglamento fue aprobado por OCAP, el 27 de septiembre de 1989, quien tenía facultad para declarar nula cualquier regla que sometieran los administradores individuales que fuera contraria a la Ley Núm. 5, *supra*, y a los reglamentos promulgados por dicha Oficina.[109] En el presente caso, OCAP aprobó el Reglamento del CBA, *supra*, y no declaró nula ninguna de sus disposiciones reglamentarias. Por ello, **para una adjudicación adecuada de la presente controversia, contrario al análisis realizado por el Tribunal de Apelaciones, no podemos soslayar las disposiciones del Reglamento del CBA**, *supra*.

La Sección 5.1 del aludido Reglamento dispone sobre el Plan de Clasificación lo siguiente:

> **El Gerente General establecerá un Plan de Clasificación para los puestos de carrera previa la aprobación de la Oficina Central de Administración de Personal.** Establecerá las normas y los procedimientos necesarios para la administración de dicho plan, en armonía con el plan de retribución que se establezca y los reglamentos aplicables a este último.
>
> El Plan de Clasificación reflejará la situación de todos los puestos en el servicio de carrera de la agencia a una fecha determinada, constituyendo

---

[108] Reglamento de Personal de la Corporación del Centro de Bellas Artes de 27 de septiembre de 1989.

[109] 3 L.P.R.A. § 1347 (2000).

así un inventario de los puestos autorizados a la agencia en todo momento. **Para lograr que el Plan de Clasificación sea un instrumento de trabajo adecuado y efectivo en la administración de personal, se mantendrá al día registrando los cambios que ocurran en los puestos, de forma tal que en todo momento el plan refleje exactamente los hechos y condiciones reales presentes, y mediante la actualización de las especificaciones de clase y las asignaciones de puestos a las clases. Se establecerán por lo tanto, los mecanismos necesarios para hacer que el Plan de Clasificación sea susceptible a una revisión y modificación continua de forma que constituya una herramienta de trabajo efectiva.**[110]

En lo que respecta a la **clasificación de puestos**, la Sección 5.6 del Reglamento del CBA, *supra*, dispone que "[t]odos los puestos se asignarán oficialmente a las clases correspondientes. No existirá ningún puesto sin clasificación. Bajo ninguna circunstancia podrá persona alguna recibir nombramiento en un puesto que no haya sido clasificado previamente".[111]

La **reclasificación de los puestos** está regulada en la aludida Sección 5.6 del modo siguiente:

Se justificará reclasificar todo puesto cuando esté presente cualquiera de las siguientes situaciones:

1. Clasificación Original Errónea

En esta situación no existe cambio significativo en las funciones del puesto, pero se obtiene información adicional que permite corregir una apreciación inicial equivocada.

2. Modificación al Plan de Clasificación

En esta situación no existen necesariamente cambios significativos en las especificaciones de los puestos, pero en el proceso de mantener al

[110] Reglamento del CBA, *supra*, págs. 5-6. (Énfasis nuestro).

[111] Reglamento del CBA, *supra*, pág. 12.

día el Plan de Clasificación mediante la consolidación, segregación, alteración, creación y eliminación de clases, surge la necesidad de cambiar la clasificación de algunos puestos.

3. Cambio Sustancial en Deberes, Responsabilidad o Autoridad

Es un cambio deliberado y sustancial en la naturaleza o el nivel de las funciones del puesto, que lo hace subir o bajar de jerarquía o la ubica en una clase distinta al mismo nivel.

4. Evolución del Puesto

Es el cambio que tiene lugar con el transcurso del tiempo en los deberes, autoridad y responsabilidades del puesto que ocasiona una transformación del puesto original.[112]

Por otro lado, la Sección 5.8 sobre **Cambio de Deberes**, Responsabilidades o Autoridad, del Reglamento de Personal del CBA dispone, en lo pertinente, lo siguiente:

Se podrá disponer cambios en los deberes, responsabilidades o autoridad de los puestos con arreglo a las siguientes normas:

1. **Todo cambio responderá a la necesidad o conveniencia de los programas gubernamentales:** ningún cambio tendrá motivación arbitraria ni propósitos disciplinarios.

2. **Conforme a lo anterior, la Corporación establecerá sus propios criterios conforme a sus particularidades.**[113]

El Reglamento del CBA, *supra*, también regula lo referente a los **ascensos** en la Sección 7.1 del Artículo 7 de la manera siguiente:

1. Objetivo de los Ascensos

**El objetivo de los ascensos es atraer al mejor personal para cubrir puestos públicos; ofrecer oportunidades para mayor progreso de sus servidores según se desarrollan sus capacidades para prestar buenos servicios;** mantener un alto nivel de satisfacción y ejecución entre los

---

[112] Reglamento del CBA, *supra*, págs. 13-14.

[113] Reglamento del CBA, *supra*, pág. 16. (Énfasis nuestro).

empleados y lograr retener en el servicio a los más capacitados.

2.  Normas sobre Ascensos

Con el fin de establecer sistemas que hagan viable el ascenso de los empleados de carrera, regirán las siguientes normas:

[…]

b) La Corporación determinará las clases de puesto que se requiere se cubran mediante el ascenso de empleados. Esta determinación se hará a base de la naturaleza de las funciones de las clases de puestos y a **las necesidades particulares de la Corporación.** Las normas específicas sobre lo establecido anteriormente estarán contenidas en las normas de reclutamiento que se establezcan para cada clase de puesto.[114]

A su vez, la misma Sección 7.1 (3) (b) del Reglamento del CBA, *supra*, dispone sobre **Ascensos sin Oposición** lo siguiente:

b) Por exigencias excepcionales y especiales se entenderá la necesidad de reclutar personal por razón de las siguientes situaciones:

(1) **Asignación o atención de nuevas funciones o programas;**

(2) Ampliación de los servicios que presta la agencia;

(3) **Necesidad de reclutar personal que logre mantener la continuidad en la prestación de los servicios sin necesidad de mayor orientación;**

[…]

(5) **Urgencia por cubrir un puesto vacante que hace impracticable el procedimiento ordinario.**[115]

III

Nos corresponde resolver si una empleada que ocupa un puesto de confianza, que de acuerdo con la Ley Núm. 5,

---

[114] Reglamento del CBA, *supra*, págs. 48-49. (Énfasis nuestro).

[115] *Íd.*, págs. 49-50.

*supra*, no le compete aprobar, crear o modificar clases de puestos para la corporación pública para la cual labora, puede ser privada de su derecho de reinstalación en un puesto de carrera tras su destitución como empleada de confianza, por recomendar transacciones de personal que no forman parte de sus funciones. Ello, a pesar de que la empleada de confianza no tenía el poder para obligar al Director de Recursos Humanos o al Gerente General (autoridad nominadora) a actuar conforme a sus recomendaciones y, además, cuando a dichos funcionarios les correspondía analizar toda recomendación recibida y aprobar o rechazar la transacción de personal en cuestión.

## A.

En el primer cargo, el CBA le imputó a la señora Ramos Román el haber recomendado la modificación de la clase de Operador de Equipo de Entrada de Datos a la clase de Asistente de Sistemas de Información; haber recomendado el ascenso del señor Arzuaga a la clase modificada sin haber obtenido la aprobación de la clase por ORHELA; y que la clase de Asistente de Sistema de Información no formaba parte del Plan de Clasificación de la agencia, razón por la cual su nombramiento era nulo. No le asiste la razón.

La señora Ramos Román recomendó la modificación de la clase en controversia de acuerdo a las discreciones conferidas a las agencias administrativas mediante la Ley Núm. 5, *supra*, y la Sección 5.1, y subsiguientes, del Reglamento de Personal del CBA, *supra*. **Estas**

**disposiciones permiten realizar los cambios necesarios en la clasificación de puestos de acuerdo a los hechos y condiciones reales de las agencias, de manera que el Plan de Clasificación sea una herramienta efectiva de trabajo.** El Reglamento del CBA, *supra*, permite que se realicen cambios en los deberes y responsabilidades de los puestos, siempre que ello responda a la necesidad o conveniencia del CBA.[116] Por ello, según su Reglamento, el CBA tiene la facultad para establecer sus propios criterios conforme a su realidad particular.[117]

Las recomendaciones efectuadas por la señora Ramos Román surgen como consecuencia de la necesidad del CBA de implantar el programa de mecanización promulgado por la OGP.[118] Ante la necesidad operacional del CBA, la señora Ramos Román optó por recomendar la modificación de un puesto existente en el Plan de Clasificación utilizado en el CBA desde el 1996.[119] Es decir, la peticionaria utilizó como herramienta de trabajo el Plan de Clasificación existente internamente en el CBA para recomendar las transacciones de personal en controversia. De las determinaciones de hechos de CASARH surge que el propósito

---

[116] Sección 5.8 del Reglamento del CBA, *supra*, pág. 16.

[117] *Íd.*

[118] *Véanse*, Determinaciones de Hechos Núm. 59, 64 y 66 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 81-83.

[119] Determinación de Hecho Núm. 55 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81.

de las recomendaciones fue mantener actualizado, aunque fuese internamente, el Plan de Clasificación que se utilizaba.

No puede escaparse de nuestro análisis la realidad particular con la cual operaba el CBA. Todos los empleados de carrera y de confianza, salvo la señora Ramos Román y su secretaria, tenían títulos de clasificación a base de un plan sin aprobar, el cual fue implantado con anterioridad a la llegada de la peticionaria. Es decir, como cuestión de hecho el CBA operó con la realidad de un plan de clasificación y retribución implantado pero no aprobado por OCALARH. Por ello, era "evidente" que "no se podía someter a OCALARH una enmienda a una clase, de un plan que no estaba aprobado por ellos y ni siquiera radicado allí".[120]

En lo que respecta al ascenso del señor Arzuaga, la Sección 4.4 de la Ley Núm. 5, *supra*, es clara a los efectos de que cada Administrador Individual tiene la facultad de determinar las clases de puestos que debido a las necesidades particulares requieren que se cubran mediante el ascenso de empleados. El propio Reglamento del CBA, *supra*, dispone que se puede reclutar personal **cuando hay una asignación de nuevas funciones o programas, o cuando hay alguna necesidad de reclutar personal que logre mantener la continuidad en la prestación de los**

---

[120] Determinación de Hecho Núm. 68 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83.

**servicios.**[121]   A su vez, dispone que se puede reclutar personal, por razones excepcionales y especiales, cuando hay una **asignación de nuevas funciones o programas; necesidad de reclutar personal para lograr la continuidad en la prestación de los servicios; o cuando hay una urgencia por cubrir un puesto vacante que hace impracticable el procedimiento ordinario.**[122]

Conforme lo anterior, y por la necesidad urgente del CBA de poner a funcionar el plan de mecanización del sistema de información promulgado por la OGP, la señora Ramos Román recomendó el ascenso del Sr. Arzuaga.  El ascenso del señor Arzuaga se realizó al evaluar su experiencia, habilidades y su desempeño en el trabajo.[123] Dicho empleado contaba con las destrezas y experiencias necesarias del puesto, además de un excelente expediente, siendo al momento de la recomendación la persona encargada de operar los sistemas nuevos de computadora.[124]

De los hechos probados ante CASARH surge palmariamente que el Gerente General del CBA, señor Girona, no consideraba oportuno reclutar a un Director de Sistemas de Información, según definido por OGP y OCALARH,

---

[121] Sección 7.1(3)(b) del Reglamento del CBA, *supra*.

[122] *Íd.*

[123] 3 L.P.R.A. § 1334 (2000).  Además, mediante el mismo se cumplió con los objetivos de los ascensos según lo dispuesto en la Sección 7.1 del Artículo 7 del Reglamento del CBA, *supra*.

[124] Determinación de Hechos Núm. 60 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 82.

porque ello resultaba oneroso ante la precaria situación económica del CBA.[125] Además, no se justificaba un puesto de tal categoría para una organización pequeña que operaba con un sistema de información que no era complejo.[126] Por ello, el mismo Gerente General delegó en el señor Arzuaga dicho trabajo.[127]

Conforme lo anterior, concluimos que el Tribunal de Apelaciones erró al adjudicarle responsabilidad a la señora Ramos Román por modificar la clase en controversia y por recomendar el ascenso del señor Arzuaga. Asimismo, el foro apelativo intermedio incidió al concluir que la clase de Asistente de Sistema de Información no formaba parte del Plan de Clasificación del CBA, cuando de las propias determinaciones de hechos de CASARH surge que ésta sí existía en el plan utilizado en el CBA para las transacciones de personal. Si bien es cierto que el CBA, como Administrador Individual, incumplió con su obligación de someter el Plan de Clasificación para la aprobación de OCALARH, no es menos cierto que la señora Ramos Román realizó la recomendación en controversia de acuerdo al plan utilizado en el CBA para las transacciones de personal. Por ello, y ante la realidad del CBA, el cual no podía someter a OCALARH enmiendas a las clases por no

---

[125] Determinación de Hecho Núm. 64 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 82.

[126] *Íd.*

[127] Determinación de Hecho Núm. 65 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 82-83.

contar con un plan aprobado por dicha entidad, no se justifica la imposición de una medida disciplinaria tan severa como la privación del derecho a la reinstalación a un puesto de carrera.

B.

En el segundo cargo, el CBA le imputó a la señora Ramos Román haber violado las disposiciones de la Ley Núm. 5, *supra*, al recomendar la reclasificación del puesto de la señora Calderón, de Secretaria de la Oficina de Servicios Generales a Oficial Administrativo por evolución de sus funciones. El CBA alegó que la reclasificación recomendada por la señora Ramos Román no procedía por evolución de funciones y que la clase de Oficial Administrativo no existía en el Plan de Clasificación utilizado por el CBA.

De entrada, es un hecho probado ante CASARH que la clase de Oficial Administrativo sí existía en el Plan de Clasificación utilizado e implantado en el CBA desde el mes de enero de 1996.[128] El CBA no ha probado que exista otra evidencia en el expediente que impida llegar a la conclusión de que dicha determinación de hecho fue razonable.[129] Por ello, la misma debe ser sostenida por los tribunales. Resolvemos, pues, que el Tribunal de Apelaciones erró al concluir que la clase de Oficial

---

[128] Determinaciones de Hechos Núm. 55 y 56 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81.

[129] *Ramírez Rivera v. Depto. de Salud*, *supra*, pág. 905; *Misión Ind. P.R. v. J.P.*, *supra*, pág. 131.

Administrativo no existía en el Plan de Clasificación del CBA.

La clase de Oficial Administrativo fue revisada y modificada en términos de funciones para hacerla más flexible y genérica. Ello, porque la especificación de clase en el Plan de Clasificación del CBA la limitaba a la Oficina del Gerente de Administración, cosa que tampoco se ajustaba a la realidad operacional del CBA.[130] La recomendación efectuada por la señora Ramos Román permitía mayores oportunidades para resolver temporeramente problemas organizacionales del CBA.[131] Además, esta clase fue modificada y aprobada por el señor Girona, Gerente General del CBA para la fecha de los hechos en controversia.[132] Ello quedó establecido, claramente, en las determinaciones de hechos de CASARH.

Por otra parte, la recomendación de la clase en controversia se fundamentó en la evolución del puesto. Ciertamente, el fundamento para la recomendación fue erróneo, toda vez que la reclasificación realmente

---

[130] Determinación de Hecho Núm. 61 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 82.

[131] Determinación de Hecho Núm. 62 de CASARH, Apéndice del *certiorari* la Peticionaria, pág. 82. Adviértase, que de acuerdo al Reglamento del CBA, *supra*, se justifica reclasificar cualquier puesto cuando surge la necesidad de cambiar la clasificación de alguno de estos para mantener actualizado el Plan de Clasificación, de manera que el mismo sea un instrumento eficaz para las operaciones del CBA.

[132] Determinación de Hecho Núm. 58 de CASARH, Apéndice del *certiorari* la Peticionaria, pág. 81.

procedía por un cambio sustancial en deberes.  Sin embargo, dicho error fue corregido por la Oficina de Recursos Humanos del CBA, quien en el descargue de sus funciones tenía el deber de tramitar el proceso de reclasificación.[133]  En específico, el Director de la Oficina de Recursos Humanos del CBA tenía la responsabilidad de analizar todas las recomendaciones que recibía, para luego efectuarlas conforme a las leyes y reglamentos aplicables.[134]  Además, la señora Ramos Román no tenía poder ni autoridad para imponer transacción alguna de personal.

**El referido error de la señora Ramos Román no es fundamento para la privación de su derecho a la reinstalación a un puesto de carrera.  La destitución de un empleado público es una medida drástica que procede en casos extremos cuando la falta es de eminente gravedad o cuando exista un estado de emergencia fiscal declarado mediante ley.[135]  El presente caso no demuestra una violación extrema en los deberes de un funcionario público.**  Por el contrario, el error cometido por la

---

[133] *Véanse*, Determinaciones de Hechos Núm. 70-72 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 83-84.

[134] *Véase*, Determinación de Hecho Núm. 70 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 83.

[135] *Domínguez Castro v. E.L.A.*, 2010 T.S.P.R. 11, res. el 2 de febrero de 2010; *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151, 167 (1973); *Lebrón Soto Mayor v. Junta*, 100 D.P.R. 164 (1971).

señora Ramos Román fue un error administrativo, el cual fue corregido sin mayores consecuencias por la Oficina de Recursos Humanos del CBA, previo a la reclasificación de la señora Calderón.    En consecuencia, el Tribunal de Apelaciones incidió al determinar que el error en el fundamento para la recomendación efectuada por la señora Ramos Román, fue una violación a la Ley Núm. 5, *supra*, de tal magnitud que justificaba privarle de su derecho a la reinstalación a un puesto de carrera.

C.

En el tercer cargo, el CBA le imputó a la señora Ramos Román haber recomendado el nombramiento regular, en **reinstalación**, de la señora Covas como Oficial Administrativo, sin que previamente ésta hubiese ocupado un puesto de carrera.  El CBA apoyó su contención en que la señora Covas sólo podía ocupar un puesto regular mediante el proceso de reclutamiento, esto es, previa convocatoria, divulgación, examen y registro de elegibles.

El Tribunal de Apelaciones concluyó que dicho nombramiento se solicitó mediante el procedimiento de reinstalación, a pesar de que ésta no procedía porque la señora Covas era una empleada de confianza.  El foro apelativo intermedio entendió que la señora Ramos Román violentó la Sección 4.3 de la Ley Núm. 5, *supra*. Finalmente, concluyó que el puesto de Oficial Administrativo no estaba comprendido dentro del Plan de Clasificación.

Es un hecho probado ante CASARH que la señora Ramos Román recomendó el nombramiento de la señora Covas a un puesto de carrera, "pero **no indicó el procedimiento o el trámite a seguir**".[136]   Ello se debió a que esa era la responsabilidad del Director de Recursos Humanos.[137]   Una vez se recomendaba un reclutamiento, la Oficina de Recursos Humanos tenía el deber ministerial de determinar la forma en que se iba a tramitar el nombramiento. Además, la aludida Oficina tenía la responsabilidad de realizar el proceso de convocatoria, divulgación, examen y registro de elegibles.   Dicha responsabilidad no recaía en la peticionaria.   Es decir, la señora Ramos Román recomendó a la señora Covas, pero el proceso de reclutamiento y selección era responsabilidad de la Oficina de Recursos Humanos y no de la Gerente de Administración.

**La señora Ramos Román no supervisaba la Oficina de Recursos Humanos en esa época, ni tenía autoridad para imponer transacción de personal alguna.**[138]   De acuerdo con la prueba testifical, "se podía proceder con un reclutamiento especial y emitir una convocatoria interna,

---

[136] Determinación de Hecho Núm. 69 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83. (Énfasis nuestro).

[137] Determinación de Hecho Núm. 70 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83.

[138] Determinación de Hecho Núm. 71 de CASARH, Apéndice del *certiorari* de la Peticionaria, págs. 83-84.

como se hizo en otras ocasiones".[139]   Pero este análisis era responsabilidad de la Oficina de Recursos Humanos.[140] Es importante señalar, que el entonces Gerente General del CBA, señor Girona, aprobó esta transacción y la refirió al Director de Recursos Humanos, sin que la peticionaria tuviera ulterior participación.

Salta a la vista y surge de las propias determinaciones de hecho de CASARH, que **la señora Ramos Román se enteró de que el nombramiento de la señora Covas se tramitó como una reinstalación mediante la carta de formulación de cargos que se le entregara.[141]   Por ello, resulta inaudito que se le haya imputado violación alguna por una recomendación que no hizo.**

El Tribunal de Apelaciones concluyó también que la señora Ramos Román violentó la Sección 4.3 de la Ley Núm. 5, *supra*.   Dicha disposición atendía los asuntos relacionados al reclutamiento y selección de personal. Estos asuntos, según consta en las determinaciones de hechos de CASARH, son responsabilidad de la Oficina de Recursos Humanos del CBA y no del Gerente de Administración, puesto que ocupaba la aquí peticionaria. Resolvemos, pues, que el Tribunal de Apelaciones erró al concluir que la señora Ramos Román recomendó el

---

[139] Determinación de Hecho Núm. 72 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 84.

[140] *Íd.*

[141] Determinación de Hecho Núm. 73 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 84.

nombramiento regular en reinstalación de la señora Covas violentando la Sección 4.3 de la Ley Núm. 5, *supra*.

Por otra parte, el Tribunal de Apelaciones concluyó que el puesto de Oficial Administrativo no estaba comprendido dentro del Plan de Clasificación. No obstante, de las determinaciones de hechos de CASARH surge que las recomendaciones en controversia se realizaron de acuerdo al Plan de Clasificación utilizado en el CBA desde antes de la llegada de la peticionaria al CBA.[142] Por lo tanto, erró el foro apelativo intermedio en este asunto.

IV

En el caso ante nos, de acuerdo con la Ley Núm. 5, *supra*, quien tenía el deber y la autoridad para crear o modificar las clases de puesto era la autoridad nominadora, en este caso el señor Girona como Gerente General del CBA y no la señora Ramos Román como Gerente de Administración. La peticionaria podía recomendar las clases de puestos que requerían modificaciones o, incluso, el personal que a su entender estaba mejor capacitado para asumir determinado puesto. **Por ello, la señora Ramos Román no puede ser responsabilizada por los nombramientos en controversia, toda vez que no era la encargada del área de Recursos Humanos a la fecha en que se cometieron las alegadas faltas y tampoco era la autoridad nominadora, de**

---

[142] Determinación de Hecho Núm. 55 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 81.

**acuerdo con la Ley Orgánica del CBA**[143] **y con la Ley Núm. 5,** *supra*. Adviértase, que la Ley Núm. 5, *supra*, define "Autoridad nominadora" como "cualquier funcionario o agencia con facultad legal para hacer nombramientos para puestos en el Gobierno".[144] Según probado ante CASARH la señora Ramos Román no tenía dicha autoridad. La función de la señora Ramos Román se limitaba a efectuar recomendaciones que podían ser consideradas o no por la autoridad nominadora y la Oficina de Recursos Humanos.[145] **A la peticionaria "no le competía someter un plan o declarar nulas las transacciones y puestos existentes", y "no tenía autoridad para obligar al Gerente General a que ejecutara sus recomendaciones".**[146] **Las mismas estaban sujetas a la decisión final del Gerente General.**[147]

Por lo anterior, podemos afirmar que "[l]a responsabilidad del Director de Recursos Humanos era analizar todas las recomendaciones que recibía y efectuar las mismas, en este caso [los] nombramiento[s], a la luz de su análisis y conforme las leyes y reglamentos

---

[143] Ley Núm. 43 del 12 de mayo de 1980.  18 L.P.R.A. § 1161, *et seq*.

[144] 3 L.P.R.A. § 1411 (2000).

[145] Determinación de Hecho Núm. 45 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 80.

[146] Determinaciones de Hechos Núm. 53 y 54, Apéndice del *certiorari* de la Peticionaria, pág. 81.

[147] *Íd*.

aplicables".[148]   Dicha evaluación fue realizada, toda vez que se conservaron en el CBA los documentos firmados por el Gerente General y la Directora de Recursos Humanos que demostraban que se había revisado y aprobado finalmente los referidos movimientos de personal recomendados por la peticionaria.[149]   Los aludidos documentos establecían claramente las respectivas especificaciones de clases de puesto que se modificaban.[150]

**Mayor importancia reviste el hecho de que no existía norma ni reglamento en virtud del cual la acción de "recomendar y permitir" fueran causas suficientes para aplicar una acción disciplinaria como la que se le aplicó a la señora Ramos Román.  Conforme lo anterior, los cargos imputados a la peticionaria no tienen mérito.**

**Luego de considerar los autos del caso ante nos, concluimos que la determinación de CASARH fue razonable y que está apoyada por evidencia sustancial que surge del expediente, razón por la cual no debemos sustituir el criterio de la agencia por el nuestro.**[151]   La actuación de CASARH no fue arbitraria, ilegal o tan irrazonable que constituya un abuso de discreción.

---

[148] Determinación de Hecho Núm. 70 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83.

[149] Determinación de Hecho Núm. 68 de CASARH, Apéndice del *certiorari* de la Peticionaria, pág. 83.

[150] *Íd.*

[151] *Otero v. Toyota, supra*, 728 (2005); *Reyes Salcedo v. Policía de P.R., supra*, 95 (1997).

Existe una práctica judicial claramente establecida de conceder gran consideración y deferencia a las decisiones de los foros administrativos.[152] Las agencias administrativas tienen una presunción de regularidad y corrección. Dicha presunción no ha sido rebatida en este caso. Ello se colige de la propia Sentencia del Tribunal de Apelaciones, al establecer que acepta como ciertas y correctas las determinaciones de hechos esbozadas por CASARH, por estar esencialmente sostenidas por el expediente administrativo y la transcripción de la vista.[153]

De acuerdo a la Ley Núm. 5, *supra*, la señora Ramos Román es acreedora del derecho a ser reinstalada en un puesto de carrera, igual o similar al que ocupaba antes de ser reclutada para el puesto de confianza en el CBA. Además, tiene derecho al pago retroactivo de los salarios dejados de percibir como empleada regular, desde la fecha en que se le impidió la reinstalación a un puesto de carrera.[154] **Para privar a la señora Ramos Román del derecho a la reinstalación a un puesto de carrera, se requiere una causa justificada basada en cargos sostenibles en alguna reglamentación o ley, o que demuestren la severidad necesaria para justificar la**

---

[152] *Otero v. Toyota*, *supra*, pág. 727; *Rebollo v. Yiyi Motors*, *supra*, pág. 77.

[153] *Véase*, Apéndice, pág. 19.

[154] *Hernández Badillo v. Municipio,* 154 D.P.R. 199, 203-204 (2001).

**privación de dicho derecho, lo que claramente no ocurrió en el caso de autos.**

**Así pues, si el CBA había perdido la confianza depositada en la peticionaria, la única alternativa que tenía era reinstalarla en su antiguo puesto de carrera o uno similar, no destituirla y privarle de éste. La privación del derecho a la reinstalación a un puesto de carrera es una medida drástica que sólo procede en casos extremos cuando la falta es de eminente gravedad o cuando exista un estado de emergencia fiscal declarado legislativamente.[155]**

V

Por los fundamentos antes expuestos, revocamos la Sentencia emitida por el Tribunal de Apelaciones. Resolvemos que la señora Ramos Román tiene derecho a ser reinstalada a un puesto de carrera igual o similar al que ocupaba antes de ser reclutada en el puesto de confianza en el CBA. Asimismo, determinamos que la peticionaria tiene derecho al pago retroactivo de sus salarios y beneficios como empleada de carrera desde el momento que se hizo efectiva la privación de su derecho a la reinstalación a un puesto de carrera.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta concurre sin opinión escrita. El Juez Presidente señor

---

[155] *Rodrigo v. Tribunal Superior, supra*, 167 (1973); *Lebrón Soto Mayor v. Junta, supra*; *Domínguez Castro v. E.L.A., supra*.

Hernández Denton disiente sin opinión escrita.   La Jueza Asociada señora Rodríguez Rodríguez disiente con Opinión escrita.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Constancia Ramos Román

     Peticionaria

       v.

                              CC-2008-742

Corporación del Centro
de Bellas Artes

     Recurrida

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 30 de abril de 2010

Disiento de la determinación que hoy anuncia una mayoría de este Tribunal pues considero que una empleada de carrera de una agencia pública que pasa a ocupar el segundo puesto de mayor jerarquía en una agencia de gobierno, en el servicio de confianza y quien, en el desempeño de sus funciones en este puesto incumple sus obligaciones y deberes dando lugar a que se violen crasamente las disposiciones sobre reclutamiento y el principio de mérito contenidas en la Ley de Personal del Servicio Público de Puerto Rico, no debe continuar en el servicio público.

Las determinaciones de hecho formuladas por la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Público (CASARH) en este caso evidencian que la alta gerencia de la Corporación de Bellas Artes gestionaba todas sus transacciones de personal en función de un plan de clasificación para el servicio de carrera **que no había sido debidamente aprobado por la Oficina de Recursos Humanos del Estado Libre Asociado, según exigía la entonces vigente Ley de Personal, Ley Núm 5 de 14 de octubre de 1975.** Como resultado, la gran mayoría de las transacciones de personal efectuadas eran ilegales y por lo tanto, nulas. A pesar de conocer este hecho, la peticionaria continuó recomendando nombramientos en virtud de dicho plan de clasificación, lo cual provocó serias desviaciones del adecuado proceso de reclutamiento y el principio de mérito fomentando que se efectuaran nombramientos nulos.

Todos los servidores públicos, pero muy en especial los que ocupan puestos de alta jerarquía en el servicio de confianza, tienen el deber y la obligación de cumplir con rigurosidad las normas de reclutamiento y retención que consagra el principio de mérito. No pueden convertirse en cómplices del menosprecio de la letra de la ley, los reglamentos y las normas que rigen la administración de recursos humanos de la agencia para la cual trabajan.

La política pública del Estado Libre Asociado de Puerto Rico, según expuesta en la Ley de Personal, *supra*, fue establecer el mérito como el valor que prima en el

servicio público.  Este principio promueve que las personas que laboran en el gobierno sean las más aptas para ello y que todo empleado reclutado, promovido, trasladado, o retenido, etc., lo fuera en consideración al mérito y a su capacidad.  Fuera queda el discrimen por motivo de raza, color, sexo, nacimiento, edad, origen o condición social, por sus ideas políticas o religiosas. *Martínez v. Oficina del Gobernador*, 152 D.P.R. 586 (2000), *Rodríguez v. BGF*, 151 D.P.R. 383 (2000).  "*La clave es la idoneidad del aspirante al servicio público*".  *Martínez v. Oficina del Gobernador*, *supra*, pág. 596 (Énfasis en el original).

Las actuaciones de la peticionaria en este caso son, como poco, un ejemplo del menosprecio de este valor tan fundamental para la buena marcha de la cosa pública. Lamento que una mayoría del Tribunal no lo aprecie así y valide la actuación crasamente negligente e irresponsable de la peticionaria.  Por todo ello, respetuosamente disiento.


                                        Anabelle Rodríguez Rodríguez
                                             Juez Asociada